**A F F I D A V I T**

**STATE OF WEST VIRGINIA**

**COUNTY OF KANAWHA, to-wit:**

I, James T. Waggy, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is submitted in support of a warrant authorizing the search of 1145 Dry Ridge Road, Saint Albans, West Virginia 25177 (SUBJECT PREMISES) as more fully described herein and in ATTACHMENT A. As set forth in this affidavit, probable cause exists that SCOTT EDWARD HUDSON (HUDSON) has committed violations of 21 U.S.C. § 846 – conspiracy to distribute a controlled substance, that is, methamphetamine and 21 U.S.C. § 841(a)(1) – possession with intent to distribute a controlled substance, that is, heroin or fentanyl, and that evidence of those offenses more particularly described herein and in ATTACHMENT B is currently located at the SUBJECT PREMISES.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since September 2002. Prior to my employment with the FBI, I was employed as a police officer with the Charleston West Virginia Police Department for over nine years, including approximately five years as a detective. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in controlled

substance investigations, white-collar crime, interviewing, interrogation, evidence collection, and legal matters, among other topics.

3. During my employment with the FBI, I have participated in many different types of criminal investigations including health care fraud, financial institution fraud, fraud against the government, kidnapping, bank robbery, and other violent crimes as well as matters relating to violent street gangs and criminal drug enterprises. In my capacity as an FBI Agent, I have received specialized training and have gained experience through everyday work in the investigation of fraud and other federal offenses. I am currently assigned to the Huntington, West Virginia Resident Agency of the Pittsburgh Division.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this investigation.

5. Beginning on May 4, 2021, the Honorable Irene C. Berger, United States District Court Judge in the Southern District of West Virginia, entered orders authorizing the interception of wire and/or electronic communications over telephones used by JASON ROBERT OXLEY (OXLEY), BRIAN DANGELO TERRY (TERRY), TREYDAN LEON

BURKS (BURKS), RAMON DAVID ALSTON (ALSTON), SHANE KELLY FULKERSON (FULKERSON) and TIMOTHY WAYNE DODD (DODD), (TARGET TELEPHONES #1 through #12). Interceptions ended on September 15, 2021. Intercepted communications occurring over the TARGET TELEPHONES have confirmed that OXLEY, HUDSON, TERRY, BURKS, ALSTON, FULKERSON, and DODD, among others (TARGET SUBECTS) are heavily involved in distributing large quantities of methamphetamine and heroin in and around Kanawha County, West Virginia and within the Southern District of West Virginia. With respect to HUDSON, numerous intercepted communications, corroborated by surveillance, have revealed that HUDSON was one of OXLEY's primary street-level distributors of methamphetamine until OXLEY's arrest on June 7, 2021. Additionally, intercepted communications revealed that HUDSON occasionally provided OXLEY with Xanax (alprazolam).

## Probable Cause

6. On September 28, 2021, a federal grand jury sitting in Charleston, West Virginia returned two indictments against the TARGET SUBJECTS. ALSTON, TERRY, BURKS, OXLEY, JONATHAN GREGORY BUSH (BUSH), SCOTT EDWARD HUDSON (HUDSON), JAMES EDWARD BENNETT, III (BENNETT), LEO ANTOINE SMITH (SMITH), KAITLYN BROOKE COMBS (COMBS), KELLY CORDLE (CORDLE), DENISE MARIE COTTRILL (COTTRILL), BRITTANY FRANCIS GILBERT (GILBERT), ANGELA DAWN HARBOUR (HARBOUR), and DOUGLAS JOHNATHAN WESLEY (WESLEY) were charged in a fifteen-count indictment of various drug and firearm related offenses.

3

FULKERSON and DODD were charged in a ten-count indictment with various drug and firearm related offenses. A warrant was issued for the arrest of HUDSON as a result of his having been indicted on one count of conspiracy to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 846, and one count each of distribution of methamphetamine and possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1).

7. On September 29, 2021 while executing the arrest warrant for HUDSON at the SUBJECT PREMISES, law enforcement observed in plain view on the kitchen counter suspected Xanax pills in a glass bottle (not in a prescription bottle) and a plastic bag containing an off white/tan powder, consistent with the appearance of a heroin/fentanyl mixture. A female, located in the residence with HUDSON, advised that Hudson was a heroin user.

BACKGROUND: ITEMS TO BE SEIZED

8. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

    a) Individuals involved in narcotics trafficking often maintain items in their residence associated with drug trafficking activity to include controlled substances and paraphernalia for packaging, weighing, cutting,

4

testing, distributing, and manufacturing controlled substances.

b) Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. It has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and co-conspirators.

c) Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences.

d) Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secret, transfer, and conceal the money by various means, including such activities as placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appear to be legitimate business or businesses; hiding money in their homes, safes and safe deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

e) Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in drug trafficking often amass and maintain assets generated by their trafficking activities or purchased with the cash earned from such trafficking. These assets are often maintained at the individual's residence.

f) Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their

person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

g) Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owing, frequenting, or controlling the residence and premises.

h) Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i) Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and

    usually maintain these items on their person and/or in their residences and vehicles.

   j) Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

  9. Documents/Records: It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade regardless of whether the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers regardless of whether the dealer is in possession of any drugs and chemicals at a given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

10. Cellular Telephones: In this case, there is probable cause that HUDSON utilizes cellular telephones to facilitate his drug trafficking activities. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, but they can also include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow their subscribers to access their device over the internet and remotely destroy all data contained on the device. For that reason, the device may only be powered in a secure environment, and if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all the data subject to seizure may be so acquired. Conversions can be hidden in

various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer. Consequently, this warrant seeks authorization to seize and secure cellular telephones found at the SUBJECT PREMISES and to search or analyze the same off-site by one or more trained examiners.

11. The investigation into the criminal activities of the above individuals reveals that their drug distribution activities are ongoing. Due to the quantities of narcotics being distributed and relatively sophisticated manner by which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long period of time. Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating. HUDSON has been involved in drug distribution for years beginning at least in March 2019 when police made a controlled purchase of methamphetamine from him and seized approximately 254 grams of methamphetamine during the execution of a search warrant at the SUBJECT PREMISES. Despite these events, HUDSON continues to distribute controlled substances. As a consequence, I believe that the items described in Attachment B will provide evidence of the events set forth in

10

this affidavit and that such articles can be found at the SUBJECT PREMESIS despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

Further your Affiant sayeth naught.

Respectfully submitted,

_____
James T. Waggy, Special Agent
Federal Bureau of Investigation

Sworn to me and subscribed by telephone or other reliable means this 29th day of September, 2021.

_____
DWANE L. TINSLEY
United States Magistrate Judge